IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

_____

LATRAVIS ALSTON, on behalf of      )
himself and all similarly          )
situated persons and entities,     )
but not limited to MARCUS          )
DANIELS, COURTNEY IRBY, YOLANDA    )
FRAZIER, KATHY MOORE, BRANDY       )
SMITH, HARDY FRAZIER, ANGELA       )
FRAZIER, and VON R. WEBBER,        )
                                   )
        Plaintiffs,                )
                                   )
vs.                                )      No. 07-2134MaV
                                   )
REGIONS BANK, N.A., PEOPLE'S       )
CHOICE AUTO SALES, LLC, and        )
JOSEPH P. WILLIAMS, a/k/a          )
JOE WILLIAMS, individually and     )
as agent of PEOPLE'S CHOICE        )
AUTO SALES, LLC,                   )
                                   )
        Defendants.                )
_____

REPORT AND RECOMMENDATION ON DEFENDANT REGIONS BANK'S REPLEVIN
CLAIMS
_____

On April 8, 2008, the defendant Regions Bank ("Regions") filed its Answer and Counter-Complaint in the above-captioned action asserting, *inter alia*, claims for replevin against six of the plaintiffs, LaTravis Alston ("Alston"), Brandy Smith ("Smith"), Marcus Daniels ("Daniels"), Courtney Irby ("Irby"), Angela Frazier, and Von R. Webber ("Webber") (collectively "the Plaintiffs"), pursuant to Tenn. Code Ann. § 29-30-101 *et seq.*, for possession of nine vehicles serving as collateral for automobile loans made by Regions. Regions' claim for replevin for the vehicles and its

motion for a possessory hearing were referred to the United States Magistrate Judge for a hearing and report and recommendation.

Pursuant to the referral, an evidentiary hearing was held on August 22, 2008, and September 17, 2008. This court heard testimony from ten different witnesses and received eighteen evidentiary exhibits. Regions called as its only witness, Curtis Hamme, Regions' Vice President of Consumer Collections, who testified as to each of the loans in question and introduced the loan papers for each loan. The Plaintiffs, whose vehicles are the subject of the replevin action, except for Alston, all testified. In addition, the Plaintiffs called Clifton Dowell and Ruben Webber who possess vehicles purchased by Rico Von Webber. The Plaintiffs also introduced excerpts from the depositions of Lisa Bailey and Elvis Schmeidekamp, employees of Regions.

After careful consideration of the statements of counsel, the testimony of the witnesses, the evidentiary exhibits, and the entire record in this case, this court submits the following findings of fact and conclusions of law and recommends that Regions be awarded immediate possession of the vehicles.

## PROPOSED FINDINGS OF FACT

In August of 2006, each of the Plaintiffs in this lawsuit purchased one or more vehicles from the defendant, The Peoples Choice Auto Sales ("People's Choice"), and financed their purchases through loans from Regions with the vehicles as collateral. The

Plaintiffs have defaulted on their loans and failed to surrender the vehicles to Regions. Regions seeks immediate possession of the vehicles under the replevin statute, Tenn. Code Ann. § 29-30-101.

The Plaintiffs claim that Regions obtained its security interests in the vehicles in question through the fraudulent activities of its employee, Teresa Parsely ("Parsley"). The Plaintiffs further claim that Regions enabled the fraud by allowing Parsley to process the loans without supervision, and, therefore, because Regions is responsible for the fraud it should not be allowed to take possession of the vehicles.

It is undisputed that Parsley, who was employed by Regions as a vice-president and loan manager, conspired with the owner of People's Choice to commit certain fraudulent acts, i.e., making vehicle loans to buyers who did not qualify for the loans at excessive interest rates for amounts that exceeded the value of the vehicles. It is further undisputed that in less than thirty days, Parsley processed more than 240 car loans totaling in excess of nine million dollars. It is also undisputed that Regions funded all the loans set out below that are at issue in this replevin claim, that the loans are all in default, and that the Plaintiffs herein are still in possession of the vehicles.

A. <u>Plaintiff Latravis Alston</u>

Alston purchased a 1995 4-door BMW 740 from the People's Choice. Alston executed a Regions Loan Application requesting a

loan to fund his purchase. (Ex. 1.) In the answer to the counterclaim, Alston admitted that he intended to enter into a contract with Regions to make monthly payments on a 1995 BMW 740. (Pl.'s Ans. to Regions Counter-Compl. at ¶5.) Alston also signed a Promissory Note and Consumer Security Agreement ("Consumer Agreement") which reflected the principal amount of the loan as $43,656.35. (Ex. 1.) The Security Agreement lists the vehicle as a BMW 745IL with a vehicle identification number ("VIN")of WABG632XSDH96375. Regions funded the loan with a payment to People's Choice for $43,551.35. The title to Alston's BMW reflects Regions as the lienholder. (Ex. 1.) The title lists the vehicle as a BMW 740 (not a BMW 745IL as indicated in the Security Agreement) but with the same VIN number as listed in the Security Agreement. Alston made only one payment to Regions in October 2006, in the amount of $767.80. Alston has possession of the BMW. Alston did not testify at the evidentiary hearing.

B.  Plaintiff Brandy Smith

Smith purchased a 2001 Mazda Millennia from People's Choice. Smith executed a Loan Request, Promissory Note, Consumer Security Agreement, Disbursement Request and Authorization, and Disclosure Statement. (Ex. 4.) Regions funded the loan with a payment to People's Choice for $19,500. (Ex. 4.) The title to Smith's Mazda Millennia reflects Regions as the lienholder. (Ex. 4.) Smith made six payments on the vehicle from October 2006 to March 2007. Smith

4

has not made any payments since March of 2007, but she has retained possession of the vehicle.

Smith testified at the hearing. Smith understood at the time she executed the Regions documents that her monthly payments would be $344.84. Smith was only concerned with her monthly car payment and not the price of the vehicle. Smith wanted to make monthly payments between $300 and $400, and her payments on her loan from Regions were less than $400 a month. Smith made payments on her vehicle until she discovered the VIN on her vehicle differed by a "digit from what is on [her] contract." Smith's only complaint against Regions is that the VIN on her loan documents differs by one digit from the VIN number on her vehicle. Smith understood that if she missed a payment or stopped making payments Regions could repossess the vehicle. According to Smith, the purchase price was supposed to be $18,000 but the loan was for over $19,605. Smith also claims that her monthly income was only $1,200 in August of 2006 but that the loan request form she signed listed her monthly income as $2,000. Smith claims that she did not tell Parsley what she was making.

Smith testified that she was rushed through the loan process, loan documents were not explained and she had no meaningful opportunity to read the documents, although she was given an opportunity to ask questions but failed to do so. She further testified that she would not have purchased the vehicle if she had

5

noticed the $1,900 discrepancy between the purchase price and the loan amount and that she will be prejudiced if her vehicle is repossessed prior to the trial on the merits, although the car is broken down and she is not driving it.

    C.    <u>Plaintiff Marcus Daniels</u>

Daniels purchased a 2002 Chevrolet Suburban from People's Choice. Daniels executed a Loan Request, Promissory Note, Consumer Security Agreement, Disclosure Statement, and Disbursement Request and Authorization in favor of Regions. (Ex. 2.) Regions funded the loan with a payment to People's Choice for $32,342.77. (Ex. 2.) The title to Daniels' Suburban reflects Regions as the lienholder. (Ex. 2.) Daniels ceased making payments in or about February of 2007.

Daniels testified at the hearing. According to Daniels, he and the salesman agreed on a purchase price of $20,000 for the vehicle. He also owed approximately $8,000 on a Taurus which was inoperable and needed to finance the payoff on the Taurus. Before he executed the loan documents, Daniels noticed that the principal amount of the loan was $32,447.77. Daniels also testified that his income was incorrect on his loan application which he signed. Daniels understood at the time he executed the documents that his monthly payment would be approximately $570. Daniels intended to grant Regions a security interest in the subject vehicle and understood that if he missed a payment or ceased making payments,

6

Regions could repossess the subject vehicle. Daniels has experienced no major problems with the Suburban, which he continues to drive. He quit paying because he couldn't afford the note.

Daniels testimony at the hearing differed in some respects from his deposition testimony, and his testimony also appeared to be rehearsed in part.

D. <u>Plaintiff Courtney Irby</u>

Irby purchased a 2002 Nissan Maxima from People's Choice. Irby executed a Loan Request, Promissory Note, and Consumer Security Agreement in favor of Regions. (Ex 3.) Regions funded the loan with a payment to People's Choice for $19,406.33. (Ex. 3.) The title to Irby's Nissan Maxima reflects Regions as the lienholder. (Ex. 3.) Irby's payments were $367.56 per month. Regions received only two payments on the loan, one in November of 2006 and the other in April of 2007.

Irby testified at the hearing that the purchase price of the vehicle was $11,500, the loan amount was $19,500, and that he understood that he was to make monthly payments in the amount of $367.56. Irby intended to grant to Regions a security interest in the vehicle. Irby understood that if he missed a payment or stopped making payments Regions could repossess the vehicle. Irby testified that he was rushed through the loan process, loan documents were not explained, and he had no meaningful opportunity to read the document. Although he was given an opportunity to ask questions, he

7

failed to do so. The co-signor on the loan was his cousin James Randall who was a car salesman for People's Choice, and Randall asked no questions. Irby still has possession of the vehicle.

E.  Plaintiff Angela Frazier

Angela Frazier purchased a 2003 Ford F-150 from People's Choice Auto. Angela Frazier agreed to purchase the Ford F-150 for $22,596.79. (Ex. 5.) Regions funded the loan with a payment to People's Choice for $22,596.79. (Ex. 5.) The title to Angela Frazier's Ford F-150 reflects Regions as the lienholder. (Ex. 5.) Angela Frazier executed the Promissory Note, Consumer Security Agreement, Disbursement Request and Authorization, and Disclosure Statement in favor or Regions. (Ex. 5.) These documents accurately reflect the terms Angela Frazier negotiated for the purchase of the Ford F150.

In October 2006, she filed bankruptcy, listing the debt to Regions on the Ford F150 as an uncontested obligation. (Ex. 17.) Regions received three equal payments of $265 from the Chapter 13 trustee in May and June of 2007. Angela Frazier later dismissed her bankruptcy, but she did not make any other payments to Regions on the Ford F-150. She is in possession of the Ford F-150.

Angela Frazier testified at the hearing. She was referred to People's Choice by her brother who worked there. She was accompanied by her husband. She testified that she did not not negotiate the purchase price but negotiated the payments of less

8

than $400. According to her testimony, the loan documents were blank when she signed them, but she later received copies of these documents in the mail and raised no questions or concerns. (Ex. 16.) Angela Frazier intended to grant to Regions a security interest in the vehicle. She was aware that the purchase price was less than the loan amount.

F.   Plaintiff Von R. Webber - Harley Davidson

Webber purchased five luxury vehicles from People's Choice within a period of five days. Webber purchased a customized Harley Davidson motorcycle from People's Choice on August 25, 2006. In connection with his purchase of the Harley Davidson motorcycle, Webber executed a Promissory Note, Consumer Security Agreement, and Disclosure Statement in favor of Regions. (Ex. 6.) Regions funded the loan with a payment to People's Choice for $59,960. The title to Webber's Harley Davidson reflects Regions as the lienholder.

Webber testified at the hearing that he agreed to purchase the Harley Davidson motorcycle for approximately $60,000, that he intended to grant to Regions a security interest in the Harley, and that he understood that if he missed a payment or stopped making payments Regions could repossess the vehicle. Regions received only two payments on the loan. Webber maintains possession of the Harley Davidson motorcycle in Las Vegas, Nevada, and no one is using it.

G.   Plaintiff Von R. Webber - 2006 Ford F-650.

On August 30, 2006, Webber purchased a customized 2006 Ford F-

9

650 super truck from People's Choice.  For the purchase of the F-650, Webber executed a Promissory Note, Consumer Security Agreement, Disbursement Agreement and Authorization and Disclosure Statement in favor Regions Bank.  (Ex. 9.)  Regions funded the loan with a payment to People's Choice for $156,500. (Ex. 9.)  The loan called for 71 monthly payments of $1,822.17 with a balloon payment of $70,000.  The title to Webber's Ford F-650 reflects Regions as the lienholder.  Regions only received two payments on the loan in October and November of 2006.

Webber intended to grant to Regions a security interest in the Ford F-650. Webber claims that he did not notice the principal amount of the loan before he executed the loan documents. Webber understood that if he missed a payment or stopped making payments Regions could repossess the vehicle.  Webber is still in possession of the Ford F-650.

H.   Plaintiff Von R. Webber-Porsche Cayman.

On August 30, 2006, Webber also purchased a brand new 2007 Porsche Cayman with his nephew, Ruben Webber.  Each co-signed for the purchase, executing a Promissory Note, Consumer Security Agreement, Disclosure Statement, and Disbursement Request and Authorization.  (Ex. 7.)  Regions funded the loan with a payment to People's Choice for $110,000.  The title to the Porsche Cayman reflects Regions as the lienholder.  Neither Webber nor his co-signor, Ruben Webber, have made payments on the Porsche since

10

February of 2007.

At the hearing, Ruben Webber testified that the purchase price of the Porsche was $57,000 but that the loan amount was $110,000 at a 7% interest rate. The loan was to be paid in monthly installments of $1,280.76 with a balloon payment of $54,772.21 on September 14, 2012. He stated that he did not buy the Porsche from the Porsche dealership because they were quoting him a much higher interest rate of 15%. Ruben Webber signed the loan documents at Parsley's office at the bank, accompanied by his uncle, Von R. Webber. Ruben Webber acknowledged that he noticed the principal amount of the loan before he signed the loan documents but that he did not question the amount. Webber and his nephew have retained possession of the Porsche Cayman. Ruben Webber testified that he drives the car to work.

I. <u>Plaintiff Von R. Webber - Infinity Q56</u>.

On August 30, 2006, Webber also co-signed with Clifton Dowell for the purchase of a 2005 Infinity QX56 from the People's Choice. Dowell worked with Webber at a bonding company. In connection with the purchase of the Infinity QX56, both Webber and Dowell executed a Promissory Note, Consumer Security Agreement, Disclosure Statement, and Disbursement Request in favor of Regions. (Ex. 8.) Regions funded the loan with a payment to People's Choice for $81,243.23. The loan called for 71 payments of $991 with a final balloon payment of $40,000. The title to the Infinity QX56 reflects

11

Regions as the lienholder.  Neither Webber nor his co-signor, Dowell, have made payment on the vehicle since April 2007.

Dowell and Webber accompanied each other to Regions Bank where they executed all the documents in question.  Webber actually made two separate trips to Regions Bank on August 30, 2006, to sign loan documents for the purchase of two different vehicles. At the hearing, Dowell testified that the purchase price for the vehicle was $32,000 and that he did not notice the principal amount of the loan before he executed the loan documents because of the way the paper was turned when it was presented to him to sign.  He claimed that he noticed the difference between the purchase price and the loan amount a few days later.  Dowell testified that he was rushed through the loan process, loan documents were not explained to him, and he had no meaningful opportunity to read the documents, although he never asked to see the documents.  He further testified that he would not have signed the loan documents if he had known that the note contained a balloon payment.

Both Webber and Dowell intended to grant Regions a security interest in the vehicle.  Both Webber and Dowell understood that if they missed a payment or stopped making payments, Regions could repossess the vehicle. Dowell has retained possession of the Infiniti QX56 which he uses as his sole means of transportation to and from work.

II. PROPOSED CONCLUSIONS OF LAW

Tenn. Code Ann. § 29-30-101 provides, in pertinent part, as follows:

> Where goods, chattels, or other items of tangible personal property are in the possession of another, the person entitled to possession thereof may recover such goods, chattels, or other tangible personal property by filing an action to recover personal property.

TENN. CODE ANN. § 29-30-101. The only issue in a replevin action is possession. *Huber v. Union Planter Nat. Bank of Memphis,* 491 F.2d 846, 849 (Tenn. 1974).

A. <u>Presumption of Validity</u>

Tennessee law recognizes a presumption in favor of the validity and regularity of written instruments. *Ali v. Prof'l Real Estate Investors*, No. M1999-00082-COA-R3-CV, 2000 WL 192562, at *4 (Tenn. Ct. App. Feb. 18, 2000), citing *Kyle v. Kyle*, 74 S.W.2d 1065, 1069 (Tenn. Ct. App. 1934). To overcome the presumption, the party challenging a written instrument has the burden of proving the invalidity of the writing. *Id*. at *3, citing *In re Rudd*, 28 B.R. 591, 593 (Bankr. W. D. Tenn. 1983).

The Plaintiffs have failed to carry their burden of proving that the Security Agreements they executed giving Regions the right to repossess the vehicle serving as collateral for the loan were invalid. All the Plaintiffs admit signing the loan documents in question, specifically the Security Agreements. Each of the Plaintiffs understood that he or she was giving Regions a security

13

interest in the vehicle and the right to repossess the vehicle if a payment was missed. Each of the Plaintiffs received the vehicle they wanted. Each of the Plaintiffs either negotiated his or her monthly payment or knew the amount of the monthly payment before signing the Security Agreement. In particular, Smith and Irby were more interested in the amount of the monthly payment and not necessarily the amount of the loan. Thus, each of the Plaintiffs agreed on the essential terms of the Security Agreement.

"[A] party to a contract is presumed to have read it." *Am. Fruit Growers v. Hawkinson*, 106 S.W.2d 564, 570 (Tenn. Ct. App. 1937) (citing 53 C.J. 975, § 113). Additionally, the law presumes a party to the contract understands the contract which he enters. *Id*. Further, the law presumes party to a contract understands its obligations and evidence is not admissible to show that his or her understanding was otherwise. *McQuiddy Printing Co. v. Hirsig*, 134 S.W.2d 197, 204 (Tenn. Ct. App. 1939). "Tennessee courts will not rewrite contracts just because they are ill-advised or the parties miscalculated future events." *Wilson v. Scott*, 672 S.W.2d 782,786 (Tenn. Ct. App. 1984).

The Plaintiffs assert that despite the general rule that parties are under a duty to ascertain the contents of contracts they sign and will be held to their obligations, Tennessee courts have at times refused to hold parties to contracts they have not read. *See, e.g., Howell v. NHC Healthcare-Fort Sanders, Inc.*, 109 S.W.3d 731,

14

733-34 (Tenn. Ct. App. 2003). Acknowledging the general rule that "it is no excuse that the contract was not read before signing," the court in *T. Brothers, Inc. v. Martin Bailey, Inc.*, 750 S.W.2d 152 (Tenn. Ct. App. 1987) nonetheless held that:

> This general rule, however, is not applicable when neglect to read the contract is not due to carelessness alone, but was induced by some strategy, trick or artifices on part of one seeking enforcement of the contract.

*T. Bros.*, 750 S.W.2d at 158. The Plaintiffs claim that their failure to read the contracts was induced by Parsley's fraudulent scheme and misrepresentations.

Although the Plaintiffs claimed they were rushed, none of them were denied the right to read the loan documents. They simply chose not to do so. None of the Plaintiffs were denied the right to ask questions. They simply did not. Von R. Webber had several opportunities to ask Parsley questions, including two different occasions at the bank, but did not. The Plaintiffs failed to prove that they were deceived in any way about the essential terms of the Security Agreements.

In addition, the court does not find the testimony of the Plaintiffs to be completely credible. The testimony at the hearing was inconsistent with the deposition testimony in several instances, particularly Smith and Webber's testimony. The testimony of the Plaintiffs at the hearing appeared to be rehearsed. Moreover, the testimony of the Plaintiffs that they would not have signed the loan papers if they had known they did not qualify is simply not

15

believable.

B. <u>Typographical or Other Errors</u>

Under Tennessee law, typographical errors or similar defects in loan documents do not defeat a claim for possession. Tennessee law merely requires a "description which reasonably identifies the property sought." Tenn. Code Ann. § 29-30-103(c)(2); *see also*, *Ingle v. Head*, No. W2006-02690-COA-R3-CV, 2007 WL 4530825 (Tenn. Ct. App. December 6, 2007) (expressly holding that an incorrect VIN does not invalidate a security interest in a vehicle). Thus, it is submitted that the incorrect VIN number on the Security Agreement signed by Smith (which differs by only one digit from the VIN on the vehicle) does not invalidate the Security Agreement. Likewise, the model number of the BMW purchased by Alston does not invalidate the Security Agreement signed by Alston.

C. <u>Equitable Lien</u>

Under the circumstances presented, even in the absence of a valid security agreement, Tennessee law recognizes an equitable lien in favor of Regions. An equitable lien is a right of a special nature over property which constitutes a charge or encumbrance so that the property itself may be proceeded against in an equitable action, and either sold or sequestered, and its proceeds or profits supplied on the debt of the person in whose favor the lien exists. *Shipley v. Metro. Life Ins. Co.*, 158 S.W.2d 739, 741 (Tenn. Ct. App. 1941). "An equitable lien arises either from a written contract which shows an

16

intention to charge some particular property with a debt or obligation or is implied and declared by a court of equity out of general considerations of right and justice as applied to relations of the parties and circumstances of their dealings." *Conister Trust Ltd. v. Boating Corp. of Am.,* No. 1998-00949-COA-R3-CV, 2002 WL 389864 at *22 (Tenn. Ct. App. March 14, 2002); *Greer v. Am. Sec. Ins. Co.*, 445 S.W.2d 904, 907 (Tenn. 1969) (quoting *Milam v. Milam*, 200 S.W. 826, 828 (Tenn. 1918)).

D.  Fraud as Defense to Immediate Possession

The Plaintiffs contend that Regions is not entitled to immediate possession of the vehicles in question because Regions' security interests in the vehicles were procured through the fraudulent activities of Parsley, its vice-president. While the fraud perpetrated by Parsley may be a valid defense by the Plaintiffs to enforcement of the contract or grounds for the Plaintiffs to rescind their contracts for the purchase of the vehicles, it does not necessarily defeat a replevin action. The Plaintiffs, however, have not chosen to rescind the contracts. Rather, they "want to have their cake and eat it, too."

All the Plaintiffs are in default on their payments under the loan agreements and have been so for at least a year or more. All the Plaintiffs continue to possess the vehicles and have refused to relinquish them. Many of the Plaintiffs continue to drive the vehicles, and the vehicles continue to depreciate in value.

*Scutti Pontiac, Inc. v. Rund*, 92 Misc.2d 881 (N.Y.Sup. 1978),

17

relied on heavily by the Plaintiffs is inapposite and not persuasive or controlling. *Scutti* did not involve the replevin of collateral for nonpaymnt of a loan as in this case. Rather, *Scutti* involved a vehicle transaction in which the purchaser traded-in his Camaro for a Ford Mustang. The purchaser, prior to taking possession of the Ford Mustang, refused to consummate the transaction because of alleged misrepresentations concerning the condition of the Ford Mustang. The dealer brought a replevin action to take position of the consumer's Camaro. While discussing recision of a contract based on fraud as a defense to a replevin, the court denied the dealer's replevin action pendente lite finding among, other things, that the title to the Camaro was not properly executed. Here, the purchasers have not attempted to rescind the contract.

E. <u>Good Faith and the UCC</u>

The Plaintiffs further argue that the Uniform Commercial Code imposes a duty of good faith, and a court can restrain collection if it finds a secured party is not acting in good faith. *See* TENN. CODE ANN. § 47-1-203.[1]

---

[1] Tenn Code Ann. § 47-1-203 provides:

> Obligation of good faith.
>
> Every contract or duty within chapters 1-9 of this title imposes an obligation of good faith in its performance or enforcement.

Tenn Code Ann. § 47-9-102 defines good faith as:

> (43) "Good faith" means honesty in fact and the observance of reasonable commercial standards of fair dealing.

18

The court finds no violation of the duty of good faith on the part of Regions in its performance or enforcement of the Security Agreements executed by the Plaintiffs. Regions has observed reasonable commercial standards in seeking enforcement of the Security Agreements.

RECOMMENDATION

For the foregoing reasons, it is recommended that Regions be awarded immediate possession of the vehicles.

s/Diane K. Vescovo
DIANE K. VESCOVO
UNITED STATES MAGISTRATE JUDGE

DATE: November 10, 2008

NOTICE

ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN TEN (10) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN TEN (10) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND FURTHER APPEAL.

ANY PARTY OBJECTING TO THIS REPORT MUST MAKE ARRANGEMENTS FOR A TRANSCRIPT OF THE HEARING TO BE PREPARED.

---

Tenn. Code Ann. § 47-9-625 sets forth remedies for a secured party's failure to comply with its obligations under the UCC:

> Judicial orders concerning noncompliance. If it is established that a secured party is not proceeding in accordance with this chapter, a court may order or restrain collection, enforcement, or disposition of collateral on appropriate terms and conditions.

19